# In the United States Court of Federal Claims

No. 15-340 C

(E-Filed:  September 28, 2015)[1]

| | |
|---|---|
| SQUARE ONE ARMORING SERVICE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) Post-Award Bid Protest; Pre- |
| | ) Award Bid Protest; Standing; |
| Defendant, | ) Justiciability; Mootness; |
| | ) Ripeness |
| and | ) |
| | ) |
| O'GARA-HESS & EISENHARDT ARMORING | ) |
| CO., LLC | ) |
| | ) |
| Defendant-Intervenor. | ) |
| | ) |

Cynthia S. Malyszek, Westlake Village, CA, for plaintiff.

Nicholas Jabbour,[2] Trial Attorney, with whom were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Donald E. Kinner, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.  Charles G. McCarthy, Office of Regional Counsel, General Services Administration, San Franciso, CA, of counsel.

---

[1]     This Opinion and Order was originally filed under seal on September 17, 2015. See ECF No. 28.  The court requested the parties to file a motion by Friday, September 25, 2015, if either party believed that the Opinion and Order should be redacted before publication.  Because neither party has filed such a motion, the Opinion and Order is published in its entirety.

[2]     Subsequent to the filing of the briefing in this case, Cameron Cohick replaced Nicholas Jabbour as the attorney of record.  See ECF No. 27.

Barbara A. Duncombe, Dayton, OH, for defendant-intervenor.[3]

OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This is a bid protest filed by Square One Armoring Service, Inc. (Square One or plaintiff) against the General Services Administration (GSA or defendant).  Compl. ¶ 1, ECF No. 1, Apr. 2, 2015.  Square One challenges as arbitrary and capricious GSA's evaluation of proposals submitted in response to a Solicitation for the procurement of armored vehicles and its award of the Solicitation to defendant-intervenor, O'Gara-Hess & Eisenhardt Armoring Co., LLC (O'Gara).  See id. ¶¶ 1–3.

Prior to the filing of Square One's complaint, GSA agreed to take corrective action by cancelling the award to O'Gara, revising the Solicitation, and inviting offerors to re-submit proposals.  See id. ¶ 9.  Square One also challenges the proposed corrective action.  Id. ¶¶ 1, 4.

The parties submitted cross-motions for judgment on the administrative record (AR) in accordance with United States Court of Federal Claims Rule (RCFC) 52.1(c).[4] See Pl.'s Mot. J. AR (Pl.'s Mot.), ECF No. 16, May 4, 2015; Def.'s Mot. J. AR (Def.'s Mot.), ECF No. 20, May 21, 2015; see also Pl.'s Resp., ECF No. 21, June 5, 2015; Def.'s Reply, ECF No. 24, June 15, 2015.  Oral argument was not deemed necessary by the court.

For the reasons explained below, plaintiff's motion is **DENIED**, and defendant's cross-motion is **GRANTED**.

I.      Background

A.      The Solicitation

On May 12, 2014, GSA issued Request for Quotations (RFQ) 873823 for the procurement of armored vehicles on behalf of the Department of Defense (DOD), Army Budget Office, in reference to Solicitation No. ID09140021 (the Solicitation).[5]  Tab 11,

---

[3]      Counsel for defendant-intervenor did not file any briefing in this case.

[4]      The government filed the administrative record (AR) under seal on April 17, 2015 in the form of a CD-ROM.  See Def.'s Notice of Filing AR, ECF No. 13.

[5]      GSA initially awarded the task order to O'Gara-Hess & Eisenhardt Armoring Co., LLC (O'Gara).  Tab 1, AR 4.  Square One filed a bid protest with the Government Accountability Office challenging the award, and GSA decided to take corrective action.

AR 62 (RFQ).  The Solicitation was directed to GSA Multiple Award Schedule (MAS) Schedule 84 contract holders, who provide "Total Solutions for Law Enforcement, Security, Facilities Management, Fire, Rescue, Clothing, Marine Craft and Emergency/Disaster Response."[6]  Id.  GSA intended to award a firm fixed price task order to furnish and armor thirty vehicles in the base year and forty-eight vehicles in each of four one-year option periods, for a total of 222 vehicles.  Id.; Tab 11c, AR 116–17. Specifically, GSA sought the following vehicles with either B4+ or B6 level of ballistic protection:

---

See id.; Compl. ¶ 12.  GSA terminated the task order with O'Gara for convenience, cancelled the solicitation, and resolicited the procurement via the May 12, 2014 RFQ. Tab 1, AR 4; Compl. ¶ 12.

[6]     The Multiple Award Schedule (MAS) program, which is also referred to as the Federal Supply Schedule (FSS) program, "is directed and managed by GSA and provides [f]ederal agencies . . . with a simplified process for obtaining commercial supplies and services at prices associated with volume buying."  FAR 8.402(a); see Tab 1, AR 3 ("The Federal Supply Schedule Program (FSS) affords federal agencies the ability to procure commonly used commercial items, such as the vehicles, customization and delivery services needed within this acquisition from prequalified sources at or below commercially available prices for an extended period of time.").

Under the MAS program, GSA awards indefinite delivery base contracts to provide supplies and services at stated prices for fixed periods of time.  FAR 8.402(a).  In Sharp Electronics Corp. v. McHugh, the Federal Circuit succinctly explained how the MAS program operates:

> GSA "acts as the contracting agent" for the federal government, negotiating base contracts with suppliers of commercial products and services.  Each supplier publishes an Authorized Federal Supply Schedule Pricelist listing the items offered pursuant to its base contract, as well as the pricing, terms, and conditions applicable to each item.  See FAR 8.402(b).  Individual agencies issue purchase orders under the base contract as needed.  The terms of the base contract, referred to as the "schedule" contract, are incorporated by reference into the order.

707 F.3d 1367, 1369 (Fed. Cir. 2013) (some internal citations omitted).

Orders placed against schedule contracts are "considered to be issued using full and open competition" and are not subject to FAR 15, which governs negotiated procurements.  See FAR 8.404(a).  Thus, agencies are advised that when "placing orders under Federal Supply Schedule contracts . . . , [agencies] shall not seek competition outside of the Federal Supply Schedules."  Id.

- Toyota Landcruiser; 200 Series SUVs, 4x4, LHD, Petro
- Toyota Landcruiser; 200 Series SUVs, 4x4, LHD, Diesel
- Chevrolet Suburban SUV; ½ Ton SUVS, 1500, 4x4
- Ford Econoline Passenger Van; E-350 XL, 2WD
- Toyota Hilux Pick-Up; Turbo Diesel 4x4

Tab 11, AR 62; Tab 11b, AR 81.

The Bill of Materials (BOM) offered detailed specifications for each of the five vehicles. Each vehicle was required to have "Standard [Original Equipment Manufacturer (OEM)] Accessories," see, e.g., Tab 11b, AR 91, as well as "Additional Required Accessories," see, e.g., id. at 95. Under the latter category, and at issue in this protest, are the requirements that each vehicle be equipped with three spare keys, and that the Toyota Landcruisers (both Petro and Diesel) be equipped with push-button ignitions while the Chevrolet Suburban SUV, Ford Econoline Passenger Van, and Toyota Hilux Pick-Up be equipped with keyed ignitions. Id. at 95, 100, 105, 110, 115.

The Solicitation advised that "[t]he Government intends to award one task order to the responsible Offeror whose quote is determined to be the best value to the Government utilizing a Lowest Price, Technically Acceptable ('LPTA') approach from a responsible Offeror with acceptable past performance." Tab 11, AR 66; see also id. at 72. To be eligible for award, "[o]fferors [were] required to meet all solicitation requirements, such as terms and conditions and technical requirements, as outlined in the GSA Multiple Award Schedule (MAS), Schedule 84." Id. at 66. The Solicitation further advised that "the Government reserve[d] the right to award no task order at all, depending on the quality of quotations(s) [sic] submitted and the availability of funds." Id.

Offerors would be evaluated according to the following factors: Technical Acceptability, Past Performance, and Price. Id. at 67. The Technical Acceptability Factor was comprised of the following Sub-Factors: Compliance with Requirements (Sub-Factor 1a), Ballistic Certifications (Sub-Factor 1b), Armoring Facility Locations (Sub-Factor 1c), and Warranty/Maintenance (Sub-Factor 1d). Id. An Unacceptable rating for any of the Sub-Factors would result in an Unacceptable rating for the entire Technical Factor—a rating that would render an offeror ineligible for award. Id.

The Solicitation advised that Sub-Factor 1a, which is at issue in this protest, would be evaluated based on the following criteria:

Offerors shall provide a line item list of all proposed items to successfully demonstrate they meet or exceed the requirements in section 6.0 of the BOM. Additionally, each item proposed shall include an easily identifiable, cross referenced MAS Schedule 84 part number, to

demonstrate that all items proposed are available on the Offer's GSA Multiple Award Schedule (MAS), Schedule 84 Contract at the time the Offeror's quote is submitted to the Government.

Id. at 68.

B.      Square One's Offer and Clarification Questions

Square One submitted a timely offer on July 11, 2014.  See Tab 27, AR 420–576. Under the "Additional Required Accessories" heading of its Technical Proposal, Square One listed the following for each of the five vehicles:

> **Spare Keys** (3 keys total per vehicle) (*Included with OEM vehicle, available as an add-on under GSA contract*)
>
> **Ignition:**  All vehicles will have a push-button ignition (*Included with OEM vehicle, available as an add-on under GSA contract*)

Id. at 430, 437, 444, 452, 460.

On September 16, 2014, a GSA representative sent Square One clarification questions regarding Square One's proposal via email.  Tab 31, AR 589.  The email stated in relevant part:

> For each of the proposed vehicles, your quote states that the 3 spare keys and the push-button ignition are "included with the OEM vehicle, available as an add-on under GSA contract."  The government has the following clarification questions:
>
> 1.      Provide the MAS Schedule 84 part number for the following items included in your proposed solution:
>
> a.      Spare Keys (3 keys total per vehicle).
>
> b.      Ignition:  All vehicles will have a push-button ignition.
>
> 2.      In addition to providing MAS Schedule 84 part numbers, if the part is "Included as an OEM item," please provide a copy of the vehicle's OEM specification demonstrating the part is included.  If the part is "Available as an add-on under GSA contract" please provide documentation demonstrating the part is currently available on Square One's GSA Schedule 84 contract.

Id.

Square One responded three days later, also by email:

Items such as the spare keys and push button ignition do not have MAS Schedule 84 part numbers because they cannot be sold alone under our GSA contract.   These items in particular are specific option items that each government customer may or may not require their OEM vehicles to contain. Our GSA contract is for armor packages and each armor package we offer has a part number.   We also offer various optional add-on items, such as the OEM vehicle itself, spare parts, winches, etc, that can be added to the armor package, but cannot be purchased as stand-alone items off of our GSA contract.  (Some government agencies provide their own OEM vehicles to be armored, which is why we list them as an option and not part of the armor package itself.)

As an example, please refer to the attached Advantage screen shot image of one of the armor packages offered in response to this RFQ (attachment contains pricing).   You will note the base product part number is "CENB4+P-TOYLC-200",  and the item name is "CEN B4+ Land Cruiser 200 w/ partition".  There is also a list of ten Options Available which can be added to the base product.  Among these is the OEM vehicle.  Please refer to the second attachment titled PP 3 GSA Approved Price List (attachment contains pricing).  This is a copy of Square One's price list approved and signed by GSA on July 2, 2014.    It was submitted as part of our Price Proposal response to this RFQ, and a redacted (prices removed) version was submitted as part of our Technical Proposal for part number cross referencing.  Please see the top of page 2 where there is a note for Group 4 (OEM Vehicles).  This note states, "The OEM prices shown below reflect current MSRP (Manufacturer Suggested Retail Price) for each make and model, for budgeting purposes.    At the time of RFQ, Square One may be able to locate vehicles priced significantly lower, depending on each customer's desired OEM specifications.  Customers are encouraged to submit detailed/desired specifications with each RFQ in order to ensure the best possible price.  OEM vehicles may only be purchased with an Armor Package."  For each vehicle model we offer, there is an "up to [max price listed], depending on desired features and options listed on RFQ for OEM vehicle."  The OEM vehicle prices vary on a case by case basis, depending on what OEM features and/or OEM upgrades each customer desires/requires (fuel type, transmission type, upholstery type, steel or aluminum wheels, extra keys, etc).

The vehicles Square One would procure for this project would be equipped with 3 keys total, as required by the RFQ.   Attached please find OEM vehicle

specification sheets for each vehicle type, as provided by our vehicle suppliers.   There is no MAS Schedule 84 part number for the keys as they are considered a feature of the OEM vehicle, which can be purchased as an option only under our current GSA schedule.  Please note that all items on our proposal which were listed as "included as an OEM item" (car alarm, radio, and keys) are marked with an asterisk on the attached spec sheets.

Regarding the push-button ignition, we have identified a typographical/formatting error in our proposal, wherein each vehicle listed on the proposal is described as having a push button ignition.  Square One confirms we can and would comply with the RFQ's specifications which are: the Toyota Land Cruisers (petrol) have push-button ignition, the Chevy Suburbans have key ignition, the Ford vans have key ignition, the Toyota Hilux have key ignition, and the Toyota Land Cruiser (diesel) have push-button ignition.   Alternatively, should the government accept our proposal as originally submitted which reflected all models being equipped with push-button start, Square One is prepared to fulfill the order with the additional feature at the originally proposed price.   The vehicles would be procured from our vehicle suppliers/dealers to include this added feature.

Regarding the items that were listed as "available as an add-on under GSA contract", please refer to attachment PP 3 GSA Approved Price List (attachment contains pricing).   Group 6 of our price list contains Options/Accessories.  Among these, are the items Square One referenced as available as an add-on under GSA contract.   These items are: run flat assemblies, tool kit, winch, road warning triangle, PA system, and spare parts.   In addition, please see each of the attached Advantage screen shots which show the brief drop-down  menu description of the options (attachments contain pricing).   All items proposed are currently offered under our GSA contract. (please note: the tool kit, winch, winch accessories, and road warning triangles are all contained under the option named Winch Kit)

Lastly, the GSA Advantage description for the CEN B4+ armor package used in the above examples states, "SQI CEN B4+ armor package with fixed partition behind second row, installed in a Toyota Land Cruiser 200 series... For complete armor package description and included options/accessories, please see GSA catalog".   Attached please find the armor package summary pages contained in our GSA catalog, for each of the armor packages contemplated in this RFQ/proposal.  Please note this catalog is available (and has been available since before the proposal due date) on our GSA Advantage page as required by GSA.   These summaries will confirm that any items listed on our proposal as "included as part of armor package on

GSA contract" are in fact part of our base armor packages offered under GSA.  Examples of this include the operable window back-up manual lifters and the first aid kit.

Tab 32, AR 591–92.

C.     Evaluation of Offers and Award Decision

Seven MAS Schedule 84 contract holders submitted offers in response to the Solicitation.  Tab 38, AR 660.  The Technical Evaluation Team determined that six of the offerors, including Square One, were technically unacceptable.  Id. at 674–92.  Only the offer from O'Gara received a rating of Acceptable for the Technical Factor.  Id. at 669–71.  Because its Past Performance Factor was also rated Acceptable, O'Gara was considered the lowest priced technically acceptable offeror, with a price of $34,159,804.96.  See id. at 693.  The government awarded O'Gara the task order on February 3, 2015.[7]  Tab 39, AR 694.

On February 4, 2015, after receiving an email notification that O'Gara had been awarded the task order, Square One requested an explanation of the award decision pursuant to FAR 8.405-2(d) (2014).  Tab 41, AR 745; see FAR 8.405-2(d) ("If an unsuccessful offeror requests information on an award that was based on factors other than price alone, a brief explanation of the basis for the award decision shall be provided.").  GSA responded the next day with the following explanation:

> Your quote was rated Technically Unacceptable and was ineligible for award for the following two reasons:
>
> 1. Your quote failed to meet the requirements of the BOM in section 6.0 for the following vehicles:
>
> 5 Chevrolet Suburban; 1/2 Ton SUVs, 1500, 4x4
> 5 Ford Econoline Passenger Van; E-350 XL, 2WD
> 5 Toyota Hilux Pick-up, Turbo Diesel 4x4
>
> These technical requirements as outlined in the BOM required the above vehicles to be supplied having keyed ignitions.  Your proposed solution included the above vehicles with push button start ignitions.

---

[7]     The originally anticipated award date for the task order was October 3, 2014.  Tab 38, AR 662.  The award was delayed, however, due to funding availability concerns.  Id.

2. Your quote failed to include the following accessory as a GSA MAS Contract item. Doing so is not in accordance with the rules governing the use of the Federal Supply Schedules (FSS) and the terms of the RFQ:

    1.  Spare Keys

In accordance with the FSS and MAS Schedule 84, an agency is not permitted to purchase open market items in an amount exceeding the micro-purchase threshold using the FSS procedures set forth in FAR subpart 8.4. The micro-purchase level applies to all open market items, in aggregate.

    a. Therefore, Square One Armoring was rated Technically Unacceptable on the following evaluation factor in Section 3.1. "Factor 1, Technical Acceptability / Sub factor 1a, Compliance with requirements:"

> *Offerors shall provide a line item list of all proposed items to successfully demonstrate they meet or exceed the requirements in section 6.0 of the BOM. Additionally, each item proposed shall include an easily identifiable, cross referenced MAS Schedule 84 part number, to demonstrate that all items proposed are available on the Offer[or]'s GSA Multiple Award Schedule (MAS), Schedule 84 Contract at the time the Offeror's quote is submitted to the Government.*

    b. In addition, Square One Armoring was rated Technically Unacceptable in accordance with the terms of the RFQ set forth in the following requirements on page 2, paragraph 3 and 4:

> *"You are to submit a quotation based on the identified items/material requested for award consideration, to include GSA Schedule Items Only."*

> *"Open Market items, in a total aggregate of $3,000.00 or less, are acceptable".*

The awardee, O'Gara-Hess & Eisenhardt Armoring Company LLC submitted the Lowest Priced, Technically Acceptable offer ($34,159,804.96). Your company's interest in doing business with The General Services Administration, and the time and effort you expended in responding to this solicitation, are very much appreciated.

Tab 44, AR 762–63.

> D.    Procedural History

On February 9, 2015, Square One filed a protest at the Government Accountability Office (GAO).[8]  See Tab 48, AR 778.  After reviewing Square One's protest, GSA "determined that corrective action [was] in the best interests of the Government."  Tab 61, AR 1084.  On March 10, 2015, GSA filed a Notice of Corrective Action with the GAO, stating that GSA would recommend that any corrective action "include an opportunity for the re-submission of proposals following a revision of the solicitation documents to provide more precise instructions to the offerors on the preparation of quotes."  Id.  In light of the proposed corrective action, GSA requested that the GAO dismiss Square One's protest.  Id.

Three days later, on March 13, 2015, the GAO dismissed Square One's protest, stating that  "[w]here, as here, an agency undertakes corrective action that will supersede and potentially alter its prior source selection decision, our Office will generally decline to rule on a protest challenging the agency's prior decision on the basis that the protest is rendered academic."  Tab 63, AR 1088.

Square One filed its complaint in this court on April 2, 2015.  Four days later, GSA terminated the task order awarded to O'Gara pursuant to FAR 8.406-5.  Tab 67, AR 1140–41.  The court understands that GSA either has cancelled or intends to cancel the Solicitation prior to re-procuring the requirement.  See Pl.'s Mot. 2 (challenging GSA's "cancellation of the solicitation"); Def.'s Mot. 15 ("GSA is taking corrective action that will include re-procuring the requirement."); Pl.'s Resp. 2 (challenging GSA's decision "to cancel the solicitation and to take corrective action to reprocure").  Defendant represents that "GSA has not yet issued a new solicitation."  Def.'s Mot. 13.

Plaintiff's complaint includes challenges to GSA's original evaluation of proposals and the award to O'Gara, see Compl. ¶¶ 37–46 (Count 1.A), 51–86 (Counts 2–5); and challenges to GSA's proposed corrective action, see id. ¶¶ 47–50 (Count 1.B), 87–90 (Count 6).  Plaintiff asks the court to find that O'Gara was ineligible for contract award, that Square One should be awarded the task order, and that the proposed corrective action is "inadequate" and in violation of the Competition in Contracting Act.  Id. at 39–40; Pl.'s Mot. 25–26.

---

[8]    Two of the unsuccessful offerors, The Armored Group and Scaletta Armoring, lodged agency-level protests on February 6 and February 10, 2015, respectively.  Tab 46, AR 766–76 (The Armored Group); Tab 55, AR 959–64 (Scaletta Armoring).  Both protests were ultimately dismissed.  See Tab 55, AR 963–64 (Scaletta Armoring) (dismissing for "fail[ing] to meet the requirements of a valid protest"); Tab 68, AR 1142 (The Armored Group) (denying as moot given GSA's decision to take corrective action).

The government asserts that the court has no jurisdiction to entertain plaintiff's protest because plaintiff cannot establish standing. Def.'s Mot. 13–20; Def.'s Reply 2–5. Alternatively, the government asserts that even if plaintiff does have standing, the GSA's corrective action was rational. Def.'s Mot. 20–24. In the further alternative, the government asserts that even if plaintiff has standing and the court finds that the GSA's corrective action was irrational, the court cannot direct award to plaintiff but, instead, should order GSA to reevaluate all the proposals. Id. at 24–26.

II.   Legal Standards

The court has "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2012). The court's "bid protest" jurisdiction encompasses the following types of agency actions: "(1) pre-award protests (i.e., objections 'to a solicitation by a Federal agency for bids or proposals for a proposed contract' or award); (2) post-award protests (i.e., objections to 'the award of a contract'); and (3) any 'alleged violation of statute or regulation in connection with a procurement or a proposed procurement.'" Sheridan Corp. v. United States, 95 Fed. Cl. 141, 148 (2010) (quoting 28 U.S.C. § 1491(b)(1)).

A plaintiff must establish standing to invoke the court's bid protest jurisdiction. See Sicom Sys., Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 975 (Fed. Cir. 2005) ("Standing to sue is a threshold requirement in every federal action."); K-Lak Corp. v. United States, 93 Fed. Cl. 749, 755 (2010) ("Even while a court may have subject matter jurisdiction over a type of claim generally, a plaintiff must still establish standing in order to invoke the court's jurisdiction." (citing Hoopa Valley Tribe v. United States, 597 F.3d 1278, 1283 (Fed. Cir. 2010))); Centech Grp., Inc. v. United States, 78 Fed. Cl. 496, 503 (2007) ("As a threshold matter, Plaintiff must establish standing to invoke the Court's jurisdiction."). A "[p]laintiff's standing must be established by a preponderance of the evidence. Centech Grp., 78 Fed. Cl. at 503 (citing Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988)); see Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [standing]."). "[A] finding that a plaintiff has failed to carry his burden of establishing standing 'precludes a ruling on the merits.'" Centech Grp., 78 Fed. Cl. at 503 (quoting Media Techs. Licensing, LLC v. Upper Deck Co., 334 F.3d 1366, 1370 (Fed. Cir. 2003)).

To establish standing under the Tucker Act, a protestor must establish that it qualifies as an "interested party."[9]  See 28 U.S.C. § 1491(b)(1) (providing that "an interested party" may object "to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement"); Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009).  The Federal Circuit has "construe[d] the term 'interested party' in § 1491(b)(1) . . . [as being] limited to actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed.

---

[9]     Defendant argues that plaintiff lacks both Article III standing and Tucker Act standing.  Def.'s Mot. 14–20.  Defendant cites to Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009), as support for its assertion that "in a bid protest action, it must be determined whether the protestor meets both the standing requirements in Article III of the Constitution and in the Tucker Act," Def.'s Mot. 13.  Indeed, the Weeks Marine court stated that although the Court of Federal Claims is an Article I court, it "applies the same standing requirements enforced by other federal courts created under Article III."  575 F.3d at 1359 (quoting Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)).  However, the Weeks Marine court further stated that the Tucker Act "imposes more stringent standing requirements than Article III."  Id.

In Jacobs Technology, Inc. v. United States, 100 Fed. Cl. 179 (2011), the court rejected the government's argument that Weeks Marine stands "for the proposition that standing must be judged both under Article III and also under the Tucker Act":

> What [Weeks Marine] says is that the Article III standing requirements are binding on the Court of Federal Claims and that so are the standing requirements of the Tucker Act.  The [Weeks Marine] court also observed that the Tucker Act has even more stringent standing requirements than does Article III.  The Weeks Marine court, then—in the context of a bid protest— did not perform any analysis under Article III, but, instead, proceeded to analyze the standing issue only under the Tucker Act.

Id. at 184 (internal citations omitted).  The Jacobs court concluded that "since the Tucker Act has even more stringent requirements on standing than Article III, it is sufficient to decide the issue of standing with reference only to the Tucker Act."  Id.; see also Mgmt. & Training Corp. v. United States, 115 Fed. Cl. 26, 35 (2014) ("[A] party that meets the Tucker Act's standing requirement presumably also satisfies the constitutional standing requirement.").  The court finds no reason to deviate from this approach.  Accordingly, the court examines only whether plaintiff meets the standing requirements of the Tucker Act.  See Jacobs Tech., 100 Fed. Cl. at 185 ("Article III standing requirements are subsumed under the Tucker Act requirements.").

Cir. 2001). Thus, "to come within the Court of Federal Claims' section 1491(b)(1) bid protest jurisdiction, [a protestor] is required to establish that it (1) is an actual or prospective [offeror], and (2) possesses the requisite direct economic interest." Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006). "[T]o establish a direct economic interest in the procurement, a protester must demonstrate prejudice." Boston Harbor Dev. Partners, LLC v. United States, 103 Fed. Cl. 499, 503 (2012) (citing Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002)).

A protestor's showing of prejudice differs depending upon the nature of the protest. In a post-award bid protest, a protester demonstrates the requisite prejudice by showing that it would have had a "substantial chance" of receiving the contract award but for the alleged errors in the procurement process. CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 481 (2013); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 691 (2010); see Rex Serv., 448 F.3d at 1308 ("To prove a direct economic interest as a putative prospective bidder, it is required to establish that it had a 'substantial chance' of receiving the contract."); Info. Tech. & Appls. Corp. v. United States (Info. Tech.), 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."). That is, a post-award protestor must show that its "chance of securing the award must not have been insubstantial." Info. Tech., 316 F.3d at 1319. "[A] showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice [in a post-award bid protest]." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). By contrast, in a pre-award bid protest, a protestor can demonstrate prejudice by establishing "a non-trivial competitive injury which can be addressed by judicial relief." Sys. Appl. & Techs., Inc. v. United States, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (quoting Weeks Marine, 575 F.3d at 1362); Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (same).

In addition to establishing that the court possesses jurisdiction over a bid protest dispute, a plaintiff must also meet the Article III justiciability requirements.[10] Article III

---

[10] "The court's inquiry into the justiciability of a case is distinct from its inquiry into whether it has jurisdiction over the case's subject matter. In other words, the court may find that it possesses jurisdiction over the subject matter of a case but that the dispute is nevertheless nonjusticiable." B&B Med. Servs., Inc., v. United States (B&B), No. 13-463C, 2014 WL 3587275, at *5 (Fed. Cl. June 23, 2014) (internal citations omitted); Coastal Envtl. Grp., Inc. v. United States, 114 Fed. Cl. 124, 129–30 (2013) (same); see Madison Servs., Inc. v. United States, 90 Fed. Cl. 673, 677 (2009) ("Notwithstanding the court's special jurisdiction and the unique nature of a bid protest, the instant matter is also subject to overarching [justiciability] doctrines governing all suits in federal court."); CCL Serv. Corp. v. United States (CCL), 43 Fed. Cl. 680, 688 (1999) (stating that the court's jurisdiction over a bid protest "is of no material consequence . . . if [the agency's]

of the Constitution provides that the "judicial Power of the United States" is vested in courts empowered to decide certain "Cases" and "Controversies." U.S. Const. art. III. The case or controversy requirement serves a dual function. <u>Flast v. Cohen</u>, 392 U.S. 83, 95 (1968). First, the case or controversy requirement "limit[s] the business of federal courts to questions presented in an adversary context and in a form historically viewed as capable of resolution through the judicial process." <u>Id.</u> Second, the requirement "define[s] the role assigned to the judiciary in a tripartite allocation of power to assure that the federal courts will not intrude into areas committed to the other branches of government." <u>Id.</u> "Justiciability is the term of art employed to give expression to this dual limitation placed upon federal courts by the case-and-controversy doctrine." <u>Id.</u>

Although the Court of Federal Claims is not an Article III court, it is well-established that various justiciability doctrines of Article III apply to this court. <u>Anderson v. United States</u>, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003); <u>see</u> <u>First Hartford Corp. Pension Plan & Trust v. United States</u>, 54 Fed. Cl. 298, 304 n.10 (2002) ("Although this [c]ourt is not an Article III court, the 'case or controversy' requirement of Article III is still applicable." (citing <u>Freytag v. Comm'r</u>, 501 U.S. 868, 889 (1991)). "Justiciability has both constitutional and prudential dimensions, and encompasses a number of doctrines under which courts will decline to hear and decide a cause. Though justiciability has no precise definition or scope, doctrines of standing, mootness, ripeness, and political question are within its ambit." <u>Fisher v. United States</u>, 402 F.3d 1167, 1176 (Fed. Cir. 2005); <u>see</u> <u>Emery Worldwide Airlines, Inc. v. United States</u>, 47 Fed. Cl. 461, 469 (2000) ("While Congress created this court under Article I of the U.S. Constitution and the 'case or controversy' requirement appears in Article III, the mootness doctrine and other justiciability precepts—including ripeness and standing—have often been properly invoked by this court.").

III.    Discussion

      A.    Square One's Challenge to GSA's Prior Evaluation of Proposals and Award to O'Gara

---

actions in canceling the solicitation render plaintiffs' challenge to these awards moot"); <u>cf.</u> <u>Madison Servs.</u>, 90 Fed. Cl. at 680 n.3 (observing that there is "lingering uncertainty as to whether, and when, [the justiciability doctrines of] ripeness or mootness may operate as a limit upon the jurisdiction of a federal court"). <u>But see</u> <u>B & B Med. Servs., Inc. v. United States</u>, 114 Fed. Cl. 658, 662 (2014) ("When a matter becomes moot, we lose subject-matter jurisdiction over it, and dismissal under RCFC 12(b)(1) is in order."); <u>CBY Design Builders v. United States</u>, 105 Fed. Cl. 303, 328–29 (2012) (similar); <u>Tech. Innovation, Inc. v. United States</u>, 93 Fed. Cl. 276, 278 (2010) ("[M]ootness presents a question of subject matter jurisdiction.").

Plaintiff contends that GSA's evaluation of proposals and award to O'Gara were flawed, improper, arbitrary and capricious, and in violation of both the Federal Acquisition Regulations and the implied duty of good faith and fair dealing.  See Compl. ¶¶ 37–46 (Count 1.A), 51–86 (Counts 2–5).  Plaintiff requests that the court undertake "de novo review" of GSA's prior evaluation of proposals, Pl.'s Resp. 1, 14, and urges the court to find that GSA "should have correctly selected Square One for contract award," because "Square One's proposal was compliant with the solicitation requirements," id. at 5.

       1.     Standing

Here, the court addresses plaintiff's challenge to GSA's original evaluation of proposals and award decision.  Cf. infra Part III.B.1 (addressing plaintiff's standing to challenge GSA's proposed corrective action).  This challenge is decidedly a post-award protest.  It is beyond dispute that Square One was an actual offeror in the original Solicitation.  Thus, Square One's standing hinges on whether it can demonstrate that it would have had a "substantial chance" of receiving the contract award but for the alleged errors in the procurement process.  See supra Part II (discussing elements of standing).

Defendant argues that because Square One's technical proposal was deemed unacceptable, Square One cannot establish that it had a substantial chance of receiving award.  Def.'s Mot. 17; see also id. at 20 ("Because of its Unacceptable rating for its Technical proposal, Square One could not be eligible for award under the original Solicitation.  Accordingly, Square One has failed to demonstrate standing pursuant to the Tucker Act in this case."); Def.'s Reply 2 (similar).[11]  As defendant correctly observes,

---

[11]     Defendant points to HomeSource Real Estate Asset Services, Inc. v. United States, 94 Fed. Cl. 466 (2010), aff'd, 418 F. App'x 922 (Fed. Cir. 2011), and Dismas Charities, Inc. v. United States, 75 Fed. Cl. 59 (2007), as support for the proposition that "where a bidder's proposal fails to meet the minimum technical requirements set forth in a solicitation, it cannot be deemed to have had a 'substantial chance' to be the awardee," Def.'s Mot. 17.  But both of the cases to which defendant cites are inapposite.

In HomeSource, the offeror's technical proposal was rated unacceptable by the agency.  94 Fed. Cl. at 480–81.  Unlike Square One, however, HomeSource did not challenge the agency's underlying evaluation of its technical proposal.  Id. at 481–82 ("HomeSource does not challenge [the agency's] underlying [technical] evaluation findings in any way.").  The court concluded that HomeSource did not have a substantial chance of being awarded the contract.  Id. at 482; see id. at 481 ("Plaintiff's offer was non-responsive to the Solicitation, and therefore would have been ineligible for the award even if plaintiff prevailed on the merits." (internal citation omitted)).

In Dismas, offerors were required to submit a Final Proposal Revision with a 120-day start-up schedule, but Dismas intentionally submitted a proposal with a 240-day start-

"GSA rated Square One's proposal as 'Unacceptable' for the Technical factor, after GSA determined that Square One failed to comply with the requirements of the Solicitation." Def.'s Mot. 17.  Defendant argues that GSA's determination that Square One failed to comply with the Solicitation's technical requirements had a rational basis.  Id. at 17–19.  Defendant's argument, however, goes to the merits of Square One's protest.  See Sci. Appls. Int'l Corp. v. United States, 102 Fed. Cl. 644, 654 (2011) ("The positions advanced—that the [a]gency did not act arbitrarily or capriciously in rating [plaintiff's] proposal as unacceptable, therefore [plaintiff] had no chance of an award, go to the merits of the controversy . . . ."); Tip Top Constr., Inc. v. United States, No. 08-352C, 2008 WL 3153607, at *11 (Fed. Cl. Aug. 1, 2008) (similar), aff'd, 563 F.3d 1338 (Fed. Cir. 2009).

The court, however, must "avoid examining the parties' arguments on the merits in order to resolve standing." Textron, Inc. v. United States, 74 Fed. Cl. 277, 285 (2006); see Info. Tech., 316 F.3d at 1319 ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.").  That is, "before reaching the merits of the parties' dispute, the court conducts only a 'limited review' of the plaintiff's allegations and the administrative record for the 'minimum requisite evidence necessary for plaintiff to demonstrate prejudice and therefore standing.'"[12] Magnum Opus Techs. Inc. v. United States, 94 Fed. Cl. 512, 530

---

up schedule.  75 Fed. Cl. at 61.  The agency evaluated Dismas' proposal on the merits and "never explicitly stated that it did not comply with the solicitation."  Id.; see id. (observing that the post-award debriefing letter stated that Dismas' proposal met all of the solicitation requirements).  The court found that "Dismas submitted a Final Proposal Revision that did not conform to the solicitation requirements," id. at 62, a determination that Dismas did not appear to dispute, see generally id. (offering no indication that Dismas argued that its 240-day start-up schedule should have been found responsive).  Accordingly, the court concluded that Dismas did not have a substantial chance of being awarded the contract.  Id. at 62.  As this court has previously suggested, Dismas "merely stand[s] for the proposition that the court may rule on the standing issue based on disqualifying elements of a protestor's proposal that the agency has overlooked." Sotera Def. Sols., Inc. v. United States, 118 Fed. Cl. 237, 251–52 (2014) (citing, inter alia, Dismas).

Thus, although in certain cases it may be true that a protestor with an unacceptable technical proposal may be unable to demonstrate standing, defendant is mistaken that technical unacceptability necessarily precludes a protestor from establishing standing.

[12]     A protester must also establish prejudice to succeed on the merits.  See Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.").  "The difference between the two [prejudice showings] is that the prejudice determination for purposes of standing assumes all non-frivolous

n.12 (2010) (quoting Night Vision Corp. v. United States, 68 Fed. Cl. 368, 392 & n.23 (2005)); see Tech Sys., Inc. v. United States, 98 Fed. Cl. 228, 244 (2011) ("[S]ince, for purposes of standing, prejudice must be analyzed before a merits determination is made, it is more properly considered as a question of potential rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings)."). Thus, "[a]t this point in the inquiry, we assume the well-pled allegations of error to be true." Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012).

Square One alleges that GSA should have rated its Technical Proposal as Acceptable, because "the clarifications submitted by Square One[] confirm that Square One was in compliance with all required terms and items of the solicitation and all items were listed on their GSA Schedule contract." Compl. ¶ 30; see also id. ¶ 52. Plaintiff maintains that GSA "ignored" Square One's clarifications. Id. ¶¶ 34, 55. As discussed in more detail above in Part I.C, after reviewing Square One's responses to its clarification questions, GSA rated Square One's Technical Proposal as Unacceptable because Square One (1) failed to include a MAS Schedule 84 part number for the three spare keys, and (2) failed to offer the requisite vehicles with keyed ignitions. Tab 44, AR 762–63; see Tab 11b (RFQ), AR 95, 100, 105, 110, 115 (requiring each vehicle be equipped with three spare keys, and that the Chevrolet Suburban SUV, Ford Econoline Passenger Van, and Toyota Hilux Pick-Up be equipped with keyed ignitions).

First, Square One alleges that its clarification clearly confirmed that each vehicle would be equipped with three keys, as the solicitation required. Compl. ¶ 58; Pl.'s Resp. 11. Plaintiff submits that "Square One has prove[n] in its clarification responses and its attachments, that the third . . . spare key was part of the OEM add-ons ordered from the manufacturer. The keys were not open market [items], they did not need a separate [part number] under Square One's GSA Schedule." Pl.'s Mot. 23; see Tab 32, AR 592 (clarification) (stating same); cf. Tab 38, AR 684 (stating that the Technical Evaluation Team's "expert consensus" was that spare keys are not OEM items and therefore do not come standard with vehicles); Pl.'s Mot. 15–19 (disputing the Technical Evaluation Team's determination).

---

allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true." L–3 Commc'ns Corp. v. United States, 99 Fed. Cl. 283, 289 (2011); see Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 694–97 (2010) (distinguishing between the two prejudice showings). Although "[t]he test for demonstrating prejudice at both the standing and merits stages of the protest is the same, . . . application of the test may yield different results due to the differing standards of review." Sys. Appl. & Techs., Inc., v. United States, 100 Fed. Cl. 687, 707 n.15 (2011), aff'd, 691 F.3d 1374 (Fed. Cir. 2012).

Next, Square One alleges that its clarification explained that its Technical Proposal merely contained a "typographical/formatting error," which identified the Chevrolet Suburban SUV, Ford Econoline Passenger Van, and Toyota Hilux Pick-Up as having a push-button ignition.  Compl. ¶ 59; Pl.'s Resp. 10.  Plaintiff states that its clarification "confirmed that these vehicles are equipped from factory with a keyed ignition and that Square One understood and would comply with the solicitation's ignition requirements." Pl.'s Resp. 10; see Tab 32, AR 592 (clarification) (stating same); cf. Tab 38, AR 688 (characterizing Square One's clarification response as an attempt to either "correct their quote to be in technical compliance with the requirements, or . . . provide vehicles with altered technical specifications"—neither of which "[could] be accepted"); Pl.'s Mot. 15, 23–24 (disputing GSA's characterization).

Finally, Square One alleges— and the government concedes, Def.'s Mot. 24—that O'Gara's Technical Proposal failed to comply with the Solicitation's requirements, and that it therefore should have received an Unacceptable rating, Compl. ¶ 29; Pl.'s Resp. 12.

The court finds that Square One has established that its chance of securing the award, but for the alleged errors, was not insubstantial.  See Info. Tech., 316 F.3d at 1319; Data Gen., 78 F.3d at 1562.  Assuming plaintiff's well-pled allegations to be true, then Square One may well have been the only technically acceptable offeror.  Defendant argues that "if GSA were to deem Square One's proposal to be technically acceptable, there is a possibility that the offers from The Armored Group and Scaletta would have to be deemed technically acceptable as well"—both of which submitted lower-priced proposals than Square One.  Def.'s Mot. 25–26; see also Def.'s Reply 7 (similar). However, an offeror "need not be next in line for the consideration of an award in order to possess standing."  Sci. & Mgmt. Res., Inc. v. United States, 117 Fed. Cl. 54, 62 (2014).  That is, plaintiff does not have the burden of showing that it would have received the contract.  See Data Gen., 78 F.3d at 1562 ("To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract.").  Based on the foregoing, the court concludes that Square One's allegations are sufficient to establish that it is an interested party to challenge GSA's original evaluation and award.

Although Square One has standing to pursue this post-award bid protest, the court finds that plaintiff's challenge to the original evaluation and award must nevertheless be dismissed on mootness grounds.

2.      Mootness

Defendant argues that "GSA's prior evaluation of proposals is no longer at issue because the award to O'Gara was cancelled prior to the filing of the complaint in this case, and GSA is taking corrective action that will include re-procuring the requirement."

Def.'s Mot. 15.  Defendant argues that "[o]nce the award to O'Gara was cancelled, any alleged injury stemming from that award was eliminated, and there is no case or controversy for this Court to adjudicate." Id.  Although framed as a challenge to plaintiff's Article III standing, see id. at 14–17, defendant essentially argues that GSA's cancellation of the award and proposed corrective action renders the original evaluation of proposals and award moot, cf. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 431 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits." (internal quotation marks omitted)).

The mootness doctrine is one of several justiciability doctrines that applies to this court.  "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" Already, LLC v. Nike, Inc., 133 S. Ct. 721, 726 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481 (1982) (per curiam)).  "[A]s a general rule, 'voluntary cessation of allegedly illegal conduct . . . does not make the case moot.'" Los Angeles Cnty. v. Davis, 440 U.S. 625, 631 (1979) (quoting United States v. W. T. Grant Co., 345 U.S. 629, 632 (1953)).  Instead, a case becomes moot when it is unreasonable to expect "that the alleged violation will recur, and . . . interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Id. (internal citations omitted).  Thus, when "corrective action adequately addresse[s] the effects of the challenged action, and the Court of Federal Claims ha[s] no reasonable expectation that the action would recur," the matter should be dismissed as moot. Chapman Law Firm Co. v. Greenleaf Constr. Co. (Chapman), 490 F.3d 934, 940 (Fed. Cir. 2007).  Moreover, "where a defendant's actions have eliminated the possibility of meaningful relief, the case ordinarily should be dismissed as moot."). McTech Corp. v. United States, 105 Fed. Cl. 726, 731 (2012); see Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (stating that a case is not moot if the "court can fashion some form of meaningful relief" (emphasis omitted)).

To be sure, when the award to O'Gara was originally made, the propriety of that award and the propriety of GSA's evaluation of proposals were "live" issues—issues that were raised by plaintiff before the GAO. See Tab 48, AR 778–926.  But those issues were rendered moot when GSA cancelled the award and filed a notice of corrective action.  Indeed, it is this rationale that prompted GAO to dismiss plaintiff's protest, stating "[w]here, as here, an agency undertakes corrective action that will supersede and potentially alter its prior source selection decision, our Office will generally decline to rule on a protest challenging the agency's prior decision on the basis that the protest is rendered academic." Tab 63, AR 1088; cf. Tab 68, AR 1142 (dismissing as moot The Armored Group's agency-level protest in light of GSA's notice of corrective action).

Plaintiff requests that the court find the award to O'Gara was improper, Compl. at 40, and to further find that "the contract should have rightfully been awarded to Square

19

One," id. at 39; see also id. ¶¶ 35, 90; Pl.'s Resp. 6–9 (arguing that the court has the
authority to award the contract to Square One). However, GSA has already cancelled the
task order award to O'Gara, Tab 67, AR 1140–41, and, notwithstanding plaintiff's
contentions to the contrary, the court is without authority to direct the award to Square
One.[13] Thus, even if the court were to find improprieties in GSA's original evaluation
and award decision, the court could only enjoin the award to O'Gara, and either order
GSA to re-evaluate the original proposals or re-procure the task order—the latter of
which is the precise action that GSA has volunteered to undertake. See infra Part III.B
(addressing plaintiff's challenge to the proposed corrective action). Notably, plaintiff
seeks to avoid GSA's re-evaluation of the original proposals. Pl.'s Resp. 17.
Accordingly, the relief that would otherwise be available has already been granted due to
GSA's decision to take corrective action. See B&B Med. Servs., Inc., v. United States
(B&B), No. 13-463C, 2014 WL 3587275, at *7 (Fed. Cl. June 23, 2014); Eskridge
Research Corp. v. United States (Eskridge), 92 Fed. Cl. 88, 94 (2010).

Moreover, plaintiff has not pointed to any case, and the court is aware of none, in
which the court proceeded to address on the merits a protest by an unsuccessful offeror
(as opposed to the original awardee) of an agency's original evaluation of proposals after
the agency had agreed to take corrective action. Rather, ample precedent exists for
dismissing as moot plaintiff's challenge to the original evaluation and award based on
GSA's decision to cancel the Solicitation and re-procure the requirement. See Coastal
Envtl. Grp., Inc. v. United States, 114 Fed. Cl. 124, 131 (2013) ("[T]he Court of Federal
Claims has consistently found that the cancellation of a procurement renders a protest of
that procurement moot." (discussing, inter alia, CCL Serv. Corp. v. United States (CCL),
43 Fed. Cl. 680 (1999))); CCL, 43 Fed. Cl. at 689–90 (concluding that the agency's
corrective action—cancelation of the solicitation and its decision to re-solicit the
procurement—rendered moot the unsuccessful offeror's challenge to the original
evaluation and award); see also B&B, 2014 WL 3587275, at *7 (concluding that an
agency's proposed corrective action—re-evaluating proposals—rendered moot an

---

[13]    "It is indisputable that the ultimate grant of a contract must be left to the discretion
of a government agency; the courts will not make contracts for the parties." Scanwell
Labs., Inc. v. Shaffer (Scanwell), 424 F.2d 859, 869 (D.C. Cir. 1970); see C.A.C.I., Inc.-
Fed. v. United States, 719 F.2d 1567, 1575 (Fed. Cir. 1983) ("[A] disappointed bidder
has 'no right . . . to have the contract awarded to it in the event the . . . court finds
illegality in the award of the contract . . . .'" (alterations in original) (quoting Scanwell,
424 F.2d at 864)); B&B, 2014 WL 3587275, at *7 n.18 ("[I]t is well settled that in the
event a court determines that the procurement was illegally conducted, the protestor has
no right to be awarded the contract."); CCL, 43 Fed. Cl. at 688 (stating that award of a
contract is an "improper exercise[] of the court's authority"); Unified Indus., Inc. v.
United States, 24 Cl. Ct. 570, 575–76 (1991) ("The Scanwell doctrine has been held to
apply to the Claims Court by well-established precedent." (citing Arrowhead Metals, Ltd.
v. United States, 8 Cl. Ct. 703, 711 (1985)).

unsuccessful offeror's challenge to the original evaluation and award); Croman Corp. v. United States, 106 Fed. Cl. 198, 212–13 (2012) (similar), aff'd, 724 F.3d 1357 (Fed. Cir. 2013); Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232, 241, 255 (2010) (concluding that an agency's completed corrective action—amendment to the solicitation and evaluation of revised proposals—rendered moot an unsuccessful offeror's challenge to the original evaluation and award); Eskridge, 92 Fed. Cl. at 94 (concluding that an agency's proposed corrective action—re-evaluating proposals—rendered moot an unsuccessful offeror's challenge to the original evaluation and award); cf. ManTech Telecomms. & Info. Sys. Corp. v. United States (ManTech), 49 Fed. Cl. 57, 65, 72–73 (2001) (reviewing alleged improprieties in the original procurement to establish a base of reference for evaluating whether the proposed corrective action—amending the solicitation and evaluating revised proposals—was reasonable), aff'd per curiam, 30 F. App'x 995 (Fed. Cir. 2002).

In light of the foregoing, plaintiff's protest as it relates to the original evaluation of proposals and award decision must be dismissed as **MOOT.**

B.     Square One's Challenge to GSA's Proposed Corrective Action

Plaintiff next contends that GSA's proposed corrective action is inadequate, improper, and violates the Competition in Contracting Act, 31 U.S.C. § 3553(d)(3) (2012).[14]  See Compl. ¶¶ 47–50 (Count 1.B), 87–90 (Count 6); id. at 39–40; Pl.'s Resp. 2, 16.

The court observes that GSA agreed to take corrective action after reviewing Square One's bid protest before the GAO and after "examin[ing] the solicitation documents, the contents of the procurement file, and the evaluation files."  Tab 61, AR 1084.  Based upon this review and examination, GSA "determined that corrective action [was] in the best interests of the Government."  Id.  GSA stated that it would "recommend the corrective action include an opportunity for the re-submission of proposals following a revision of the solicitation documents to provide more precise

---

[14]     Unlike plaintiff's challenges to the original evaluation of proposals and award decision, plaintiff's challenges to the proposed corrective action are not moot.  See Croman Corp. v. United States, 106 Fed. Cl. 198, 213 (2012) (concluding that the plaintiff's protest as to the original evaluation and award decision was moot but that its protest of the "agency's corrective action as being insufficient to cure the alleged errors committed by the agency" was not moot), aff'd, 724 F.3d 1357 (Fed. Cir. 2013); McTech Corp. v. United States, 105 Fed. Cl. 726, 732 (2012) (holding that a pre-award protest challenging the scope of an Agency's proposed corrective action was not moot); Centech Grp., Inc. v. United States, 78 Fed. Cl. 496, 504 (2007) (observing that although "an agency's offer to institute corrective action renders a protest moot . . . in some circumstances," where "the corrective action is itself the agency decision which is being challenged[,] . . . it does not moot the . . . action").

instructions to the offerors on the preparation of quotes." Id.  GSA subsequently canceled its task order award to O'Gara, Tab 67, AR 1140–41, and the court understands that GSA either has cancelled or intends to cancel the Solicitation prior to re-procuring the requirement, see Pl.'s Mot. 2 (challenging GSA's "cancellation of the solicitation"); Def.'s Mot. 15 ("GSA is taking corrective action that will include re-procuring the requirement."); Pl.'s Resp. 2 (challenging GSA's decision "to cancel the solicitation and to take corrective action to reprocure").  Defendant represents that "GSA has not yet issued a new solicitation."  Def.'s Mot. 13.

"As the Federal Circuit [has] recognized, this [c]ourt possesses jurisdiction to determine if the corrective action taken by a procuring agency as a result of a bid protest was reasonable under the circumstances."  Centech Grp., 78 Fed. Cl. at 506 (citing Chapman, 490 F.3d at 938 ("[T]he Court of Federal Claims' inquiry into the reasonableness of the Government's first proposed corrective action, and the court's subsequent determination that the proposed corrective action was not reasonable, were proper.")); see also Croman, 106 Fed. Cl. at 213 (stating that "[p]laintiff's contention that the corrective action was inadequate to address the alleged errors falls within this court's bid protest jurisdiction"); McTech, 105 Fed. Cl. at 732 (stating that "the court has juridical power to entertain a complaint challenging proposed corrective action"); ManTech, 49 Fed. Cl. at 73 (examining whether "the proposed corrective action [was] reasonable under the circumstances and appropriate to remedy the alleged improprieties that occurred" (capitalization omitted)); DGS Contract Serv., Inc. v. United States, 43 Fed. Cl. 227, 238 (1999) (similar).  That GSA has not yet implemented the corrective action and that Square One was not the original awardee are not "material to the question of jurisdiction."  Sys. Appl. & Techs., 691 F.3d at 1381.  The Federal Circuit "has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented."  Id.

Although the "court may have subject matter jurisdiction over a type of claim generally, a plaintiff must still establish standing in order to invoke the court's jurisdiction."  K-Lak Corp., 93 Fed. Cl. at 755; cf. Sys. Appl. & Techs., 691 F.3d at 1382 (examining both (1) whether this court "properly exercised its jurisdiction" over the disappointed bidder's pre-award protest, and (2) whether this court properly determined that the disappointed bidder had standing to pursue the protest).

      1.    Standing

Here, the court addresses plaintiff's challenge to GSA's proposed corrective action.  Cf. supra Part III.A.1 (addressing plaintiff's standing to challenge GSA's original evaluation and award decision).  Challenges to corrective action that involve re-solicitation of proposals have generally been treated as pre-award protests.  See, e.g., Sys. Appl. & Techs., 691 F.3d at 1382 ("[Plaintiff] lodges a pre-award protest against the Army's decision to resolicit proposals."); Sheridan, 95 Fed. Cl. at 148 ("Where the

plaintiff . . . files a protest challenging an agency's decision to resolicit proposals, this Court has held that plaintiff's protest 'is in the nature of a pre-award claim.'" (quoting IMS Servs., Inc. v. United States, 32 Fed. Cl. 388, 398 (1994))); see also Reema Consulting Servs., Inc. v. United States, 107 Fed. Cl. 519, 529 (2012) (applying the pre-award prejudice test to determine whether plaintiff had standing to challenge the agency's proposed corrective action (reprocurement)); Centech Grp., 78 Fed. Cl. at 505 (characterizing a plaintiff's challenge to the agency's corrective action as an alleged violation of "preaward conduct").

The government does not dispute that Square One is a prospective offeror.  Thus, Square One's standing hinges on whether it can demonstrate a non-trivial competitive injury that can be addressed by judicial relief.  See supra Part II (discussing elements of standing).

Defendant essentially argues that Square One cannot demonstrate a non-trivial competitive injury because Square One actually benefits from GSA's proposed corrective action.  See Def.'s Mot. 15.  Because GSA is reprocuring the Solicitation, Square One "will have the opportunity to be awarded the task order in any possible future procurement."  Id.  Plaintiff counters that reprocuring the Solicitation "just adds more injury to Square One who must spend more time and money in writing and submitting a third proposal."[15]  Pl.'s Resp. 15; see also id. at 3 ("Square One is harmed and does not benefit from GSA's re-procurement because it will be an added expense of time and monies in preparing a third proposal.").

Plaintiff has the burden of establishing its standing by a preponderance of the evidence.  See Lujan, 504 U.S. at 561; Centech Grp., 78 Fed. Cl. at 503.  But plaintiff cites to no authority that suggests that a disappointed offeror's voluntary incursion of costs to recompete for contract award for which it remains eligible qualifies as a non-trivial competitive injury.[16]  Simply stated, GSA's reprocurement does not deprive

---

[15]     The proposed corrective action will be the second corrective action taken by GSA in this procurement.  See supra note 5 (referencing the first corrective action).

[16]     To be sure, the court has consistently found that requiring the original contract awardee to recompete for contract award further to an agency's corrective action qualifies as a non-trivial competitive injury.  See, e.g., Sys. Appl. & Techs., 691 F.3d at 1382 (concluding that the plaintiff had standing because "[a] arbitrary decision to take corrective action without adequate justification forces a winning contractor to participate in the process a second time and constitutes a competitive injury to that contractor"); Navarro Research & Eng'g, Inc. v. United States, 106 Fed. Cl. 386, 404 (2012) (finding that the plaintiff had standing because it was the successful "contract awardee not once, but twice"); CBY Design Builders, 105 Fed. Cl. at 337 ("If, as [plaintiff] alleges, it is arbitrarily being required to win the same award twice, this is certainly the sort of non-

Square One of the opportunity to compete for contract.  See Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (finding that loss of "the opportunity to compete" affected the plaintiffs' direct economic interest); MORI Assocs., Inc. v. United States, 102 Fed. Cl. 503, 542 (2011) (same).  Because Square One has failed to establish a redressable competitive injury resulting from GSA's decision to reprocure the Solicitation, the court concludes that Square One is not an interested party.  Accordingly, plaintiff's protest as it relates to the proposed corrective action must be dismissed because plaintiff **LACKS STANDING**.

In the interest of completeness, the court also addresses the justiciability doctrine of ripeness, which serves as an alternative ground for dismissing plaintiff's challenge to the proposed corrective action.

2.      Ripeness

"The justiciability doctrine of ripeness circumscribes the court's review to cases that present realized rather than anticipated or hypothetical injuries."  Madison Servs., Inc. v. United States, 90 Fed. Cl. 673, 678 (2009) (citing United Public Workers of Am. v. Mitchell, 330 U.S. 75, 89–90 (1947)).  "A claim is not ripe where it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  Texas Bio- & Agro-Def. Consortium v. United States, 87 Fed. Cl. 798, 804 (2009) (quoting Thomas v. Union Carbide, 473 U.S. 568, 581 (1985)); see also Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652, 658 (2003) (quoting Texas v. United States, 523 U.S. 296, 300 (1998)).  Thus, "the ripeness doctrine . . . prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies."  Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).  It also operates "to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  Id. at 148–49.  An agency action is "ripe for judicial review" when (1) it "marks 'the consummation of the agency's decisionmaking process,' i.e., it [is] not . . .  merely tentative or interlocutory," and (2) it determines "rights or obligations" or is one "from

---

trivial competitive injury sufficient to support its standing to object to the corrective action."); Centech Grp., 78 Fed. Cl. at 504 (concluding that the plaintiff had standing because it "was stripped of its status as the successful awardee de facto and relegated to competing anew"); cf. Sys. Appl. & Techs., Inc., v. United States, 100 Fed. Cl. 687, 708 (2011) (observing that "in almost every decision in which the standing of a contract awardee to protest a procuring agency's corrective action was addressed, the court has concluded that the protester had standing" (emphasis added)), aff'd, 691 F.3d 1374 (Fed. Cir. 2012).  Here, however, it is O'Gara, the defendant-intervenor, that was the original contract awardee—not Square One.

which legal consequences will flow." NSK Ltd. v. United States, 510 F.3d 1375, 1385 (Fed. Cir. 2007) (quoting Bennett v. Spear, 520 U.S. 154, 177 (1997)).

The court first addresses plaintiff's contention that GSA's decision to amend the solicitation and re-procure the task order was "improper" because Square One was "an acceptable [offeror] next in line" for award. Compl. ¶ 90. In plaintiff's view, "[t]here was no need to resolicit," because "the contract [should have been] issued to Square One." Id. Plaintiff essentially argues that awarding the contract to Square One was the only reasonable corrective action GSA could have taken under the circumstances—an argument premised on a finding that GSA should have rated Square One's Technical Proposal as Acceptable. However, the court has already found that GSA's evaluation of the original proposals is moot. See supra Part III.A.2. Moreover, even assuming arguendo that plaintiff were correct, the court is without authority to direct the award to Square One. See supra note 13.

The court next addresses plaintiff's contention that "[i]n a re-procurement, Square One would only correct its typographical error and again explain that its armor package under the GSA Schedule does not have GSA part numbers as it is an option, and those part numbers would be a manufacturer number." Pl.'s Resp. 16. As defendant correctly observes, Def.'s Reply 9, plaintiff may raise any concerns regarding its ability to comply with the amended solicitation in a pre-award bid protest, see Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308, 1313 (Fed. Cir. 2007); see also Centech Grp., 78 Fed. Cl. at 505 ("As the Federal Circuit has recognized, the challenge to terms of a solicitation containing a patent error must be raised preaward or the ability to raise such an objection is waived." (citing Blue & Gold Fleet, 492 F.3d at 1313)). Thus, any claims plaintiff might have in the future regarding the language of the amended solicitation would be the subject of a different protest action. Such claims are not currently ripe for review.

The court now turns to plaintiff's suggestion that GSA's decision to reprocure the Solicitation is merely a pretext for affording O'Gara an additional opportunity to correct its proposal. Pl.'s Resp. 3. In plaintiff's view, "there is an appearance of impropriety and a concerted effort to award to one offeror over the others." Id. at 15; see id. at 5 ("It appear[s] that the GSA was trying to find fault with Square One and trying to excuse O'Gara."); Compl. ¶ 81 ("[T]he corrective action is a breach of good faith and fair dealing because it is merely an excuse and [an attempt] to get more time for [O'Gara] . . . to list its items on its GSA Schedule.").

Plaintiff acknowledges, as it must, that there is "[a] strong presumption that government officials act correctly, honestly, and in good faith when considering bids." Pl.'s Resp. 15 (citing Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 502 (2009)). Indeed, the court is "required to assume that the Government [will] carry out the corrective action in good faith." Chapman, 490 F.3d at 940; see also Croman, 724 F.3d at 1364 ("The presumption that government officials act in good faith

is enshrined in our jurisprudence."). Moreover, this court has stated that, "[a]bsent countervailing indications, this presumption ought to be at its zenith where the government has yet to act." Boston Harbor Dev. Partners, 103 Fed. Cl. at 503. Plaintiff argues, however, that this good faith presumption "is voided [when] the agency is allowing a third try to a bidder and time to correct and be responsive to the solicitation." Pl.'s Resp. 15.

The court agrees with defendant that "Square One's allegation that a re-procurement is a pretext to find a way to award the contract to O'Gara is entirely without basis." Def.'s Mot. 15. Where, as here, a plaintiff alleges that the government has acted in bad faith, the plaintiff must offer "well-nigh irrefragable proof" in support of its claim. Croman, 724 F.3d at 1364 (internal quotation marks omitted); Chapman, 490 F.3d at 940. Square One's unsubstantiated allegations, however, do not approach the well-nigh irrefragable proof necessary to overcome the presumption that government officials act in good faith. Accord Eskridge, 92 Fed. Cl. at 95, 95 n.8 (concluding same); cf. Def.'s Mot. 15 ("[I]f GSA officials truly were predetermined to award the task order to O'Gara, canceling the award to O'Gara and re-procuring the requirement seems an inefficient way to accomplish the goal.").

The court also agrees with defendant that "[a]ny allegation that GSA's officials will not act in good faith in executing the corrective action, which includes re-procuring the requirement, raises purely hypothetical arguments about future events that [might] or [might] not occur." Def.'s Mot. 15; see also id. at 15–16 ("Square One's allegations raise nothing more than a basis for a purely academic discussion about what could happen when GSA re-procures the task order."). If at the conclusion of the re-procurement process, the record establishes that GSA "did not properly carry out the corrective action," Square One will have the opportunity to challenge the new award decision. See Eskridge, 92 Fed. Cl. at 95; cf. Pl.'s Resp. 9, 17 (acknowledging that Square One could return to this court to challenge GSA's administration of the corrective action). Thus, plaintiff's anticipated claims regarding the implementation or execution of GSA's proposed corrective action are not yet ripe for review. See Eskridge, 92 Fed. Cl. at 95 (concluding that the protestor's "[c]hallenges to the outcome of th[e] [corrective] action at this time are . . . not fit for judicial review").

In light of the foregoing, plaintiff's protest as it relates to the proposed corrective action must be dismissed as **UNRIPE**.

C.    The Court Lacks Jurisdiction Over Square One's Claim for Bid Protest Costs

Square One contends that it "is entitled to an award of protests costs, including attorneys' fees." Pl.'s Mot. 26; see Compl. at 40 (requesting an award of "reasonable attorney's fees, costs and expenses of this matter). This court, however, does not have

jurisdiction to entertain plaintiff's request for bid protest costs or related attorney's fees. "[T]he Tucker Act only allows recovery for bid preparation and proposal costs." S.K.J. & Assocs., Inc. v. United States, 67 Fed. Cl. 218, 225 (2005) (citing 28 U.S.C. § 1491(b)(2)); see Coastal Envtl. Grp., 114 Fed. Cl. at 132 (quoting same).

To the extent that Square One seeks bid preparation and proposal costs, see Pl.'s Resp. 3, 15, Square One is not entitled to such relief.  GSA is re-procuring the Solicitation, and Square One retains the opportunity to compete for the task order.  As such, plaintiff's investment in its proposals is not "a needless expense and [plaintiff] may yet see the fulfillment of the promise of fair and impartial consideration which induced it to spend its money to prepare its bid."  Beta Analytics Int'l, Inc. v. United States, 75 Fed. Cl. 155, 159 (2007) (internal quotation marks and citations omitted); B&B, 2014 WL 3587275 at *7 n.18 ("B & B's request for bid preparation and proposal costs is not yet ripe because B & B remains in the competition for the contract and may be awarded the contract."); see Tech. Innovation, Inc. v. United States, 93 Fed. Cl. 276, 279 n.12 (2010) (observing that the plaintiff's "claim for bid preparation and proposal costs would seem to be mooted by the [agency's corrective action]"); CCL, 43 Fed. Cl. at 693 (dismissing as moot plaintiff's request for bid preparation costs in light of the agency's corrective action); cf. Def.'s Reply 8 ("We are aware of no authority for awarding costs to an unsuccessful offeror who will have the opportunity to re-compete for an award.").

IV.    Conclusion

Because plaintiff's bid protest is "trapped between the devil and the deep blue sea of ripeness and mootness," plaintiff has failed to allege a justiciable controversy. Madison Servs., 90 Fed. Cl. at 678.  Moreover, plaintiff lacks standing to challenge the proposed corrective action.  Accordingly, plaintiff's motion is **DENIED**, and defendant's cross-motion is **GRANTED**.  Plaintiff's bid protest is **DISMISSED**.  The Clerk of Court shall enter judgment accordingly.  No costs.

The Clerk of the Court shall assign to the undersigned any future protests involving re-procurement of the subject solicitation.  If a future protest is filed, the parties shall indicate in their filing that the case is related to this one and request that it be assigned to the undersigned.

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge